# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

**KELLY MILLER-SPENCER,**     )
                              )
       **Plaintiff,**     )
                              )
                              )  **CIVIL ACTION**
**v.**                        )
                              )  **Case No. 09-2470-CM**
**DILLON COMPANIES, INC.,**   )
                              )
       **Defendant.**     )
                              )

## MEMORANDUM AND ORDER

Plaintiff Kelly Miller-Spencer brings this race and gender discrimination case pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Plaintiff is a store manager for defendant Dillon Companies, Inc. Plaintiff alleges that defendant transferred her from one store to another in 2008, negatively impacting her income. Plaintiff claims that the transfer constituted disparate treatment because it was motivated by her race and/or gender, and that defendant's transfer practice has a disparate impact on African-American and/or female managers. Defendant filed a motion for summary judgment (Doc. 37), arguing that plaintiff cannot establish a prima facie case of race or gender discrimination.

## I. FACTUAL BACKGROUND[1]

---

[1] The court construes the facts in the light most favorable to plaintiff as the non-moving party pursuant to Fed. R. Civ. P. 56. The court's effort to identify uncontroverted facts, however, was undermined by plaintiff's failure to comply with D. Kan. 56.1. The court's local rule requires that the non-moving party set forth any additional facts in separately-numbered paragraphs. Instead of following the rule's directive, plaintiff scattered facts throughout her brief, providing citations primarily in footnotes and at times in text. This alone violates Rule 56.1. But plaintiff also failed to actually attach relevant portions of the documents she referenced in footnotes. This further violates the court's local rule. Had defendant not helped complete the record by providing the excerpts that plaintiff omitted, the court would have had no choice but to ignore all of plaintiff's additional facts, as they would not be supported by the record. The court would be justified in doing so. *See Biglow*
(continued...)

Defendant hired plaintiff—an African-American female—in 1986, and plaintiff has served as a store manager for defendant since 1997. She is the only African-American female manager in defendant's 120 stores.

Defendant has transferred plaintiff from store-to-store a number of times over the years. In 2008, defendant transferred plaintiff from Store #67 to store #47. Bob Foster, a Caucasian male, replaced plaintiff at Store #67. In 2004, defendant transferred plaintiff from Store #54 to Store #67, and replaced her with Neil Dunham, also a Caucasian male. Plaintiff's claims in this action relate to the 2008 transfer.

## A. *Defendant's Transfer Policies and Procedures*

Transfers are common for defendant's store management personnel. During the 24-month time period preceding plaintiff's 2008 transfer, at least 23 managers and 109 assistant store managers transferred from one store to another. In fact, defendant requires its store managers to be

---

[1] (...continued)
*v. Boeing Co.*, 182 F. Supp. 2d 1037, 1039 (D. Kan. 2001) ("Because plaintiff has violated the local rule, the Court disregards the factual assertions contained in this section of his brief.") (citing *Clemmons v. Nelson*, No. 94-3474-KHC, 1998 WL 726077, at *1–2 (D. Kan. Sept. 4, 1998)); *see also Sellers v. Butler*, No. 02-3055-DJW, 2006 WL 2873470, at *2 (D. Kan. Oct. 5, 2006) (collecting cases and discussing approaches for handling briefs filed in violation of local rules).

The court utilizes D. Kan. R. 56.1 to simplify and standardize briefing on summary judgment and to help the parties address and the court review the motion in an efficient and effective manner. Defendant was prejudiced by having to hunt down additional facts in plaintiff's brief and identify and attach excerpts of depositions that plaintiff neglected to provide the court. In light of these considerations, the court exercises its discretion to disregard plaintiff's factual statements not made in accordance with Rule 56.1. *See Honeycutt v. Ringgold*, No. 10-6077, 2010 WL 3818062, at *3 n.1 (10th Cir. Oct. 1, 2010) (upholding district court's decision to deem facts admitted for failure to comply with the Western District of Oklahoma's local rule). *But see Amundsen v. Jones*, 533 F.3d 1192, 1197–98 (10th Cir. 2008) (determining that the district court did not abuse its discretion when it elected to consider a factual statement that did not comply with Utah's local rule governing summary judgment briefs). The facts presented below are largely—if not exclusively—those offered by defendant in support of its motion.

willing to accept assignments at stores across the state and potentially across the country.

Defendant's transfer policy benefits the stores because new managers bring fresh ideas, policies, and attitudes. New management also helps prevent complacency in hourly employees.

Defendant does not have a written policy requiring the Vice President of Operations (who makes store transfer decisions) to consider specific factors in making transfers. But the Vice President of Operations always looks at "what the store needs first of all, the skill set of the store manager, and what would make the best business sense going forward for the company." (Doc. 38, Ex. F, at 17.) As Cezanne Weis, defendant's Manager of Human Resources, testified in deposition, a transfer decision is "really just a matter of the right fit at the right time. And since those circumstances vary, it—it's really who's the right fit for that store at that time." (Doc. 38, Ex. G, at 19.) Defendant does not consider manager performance evaluations or the stores' sales volumes in transfer decisions. The deposition testimony that plaintiff cites to controvert this fact does not support plaintiff's position.[2]

Stacie Falor, plaintiff's district manager, considers a transfer from a higher-volume store to a lower-volume store as a promotion, as it serves as a growth opportunity for the manager. Likewise, each store is tracked and ranked by the percentage increase in sales; not sales volume. Managers of lower-volume stores may have an easier time achieving a higher percentage increase in sales because a small increase in sales can have a bigger impact.

## B. *Managerial Bonuses*

Defendant pays its managers semi-annual bonuses based on their performance on store-specific goals. Each store has a "bonus potential," or a maximum bonus that a manager could earn

---

[2] Although plaintiff did not provide the court with the relevant excerpts, defendant did provide all but page 67 of plaintiff's deposition. Because the record before the court does not contain page 67, the court was unable to review that portion of plaintiff's deposition.

-3-

at that store, given its sales volume. "Bonus payout," on the other hand, is the actual amount that defendant pays a manager based on his or her performance, which is measured against the store's bonus plan criteria.

Defendant does not guarantee that a manager will receive 100% of a store's bonus potential. In fact, managers rarely achieve 100% of their bonus potential. Store sales volume constitutes one element of bonus calculation, but other factors are based on store-specific goals. These may include "adherence to company initiatives, cashier management, dairy department cleanliness, or average queuing time." (Doc. 38, Ex. B, at 7; Ex. A, at 103.) In 2008, defendant's bonus plan specified that sales volume was weighted at 35% of the bonus calculation.

In February 2008, Store #67's bonus potential was $20,000. The bonus potential at Store #47 was $17,000. After defendant transferred Mr. Foster to Store #67, he received an actual bonus payout of $3,923 for the second half of 2008. For the same time period at Store #47, defendant paid plaintiff an actual bonus payout of $3,642. In the years leading up to the 2008 transfer, plaintiff achieved various percentages of her bonus potential, ranging from 30% to 65.3%.

Defendant's bonus plans change every year. In 2008, defendant finished a transition of its bonus plans to match those of its parent company. As a result, all bonus potential was lowered. Store #67's bonus potential fell from $23,000 to $20,000 in accordance with this company-wide change. If plaintiff had remained at Store #67, her bonus potential would have fallen to $20,000 in 2008. But instead, when she transferred, defendant allowed her to keep her $23,000 bonus potential for one year at Store #47, despite the fact that the bonus potential for Store #47 should have been $17,000.

In 2008, defendant's actual bonus payouts were significantly lower than in previous years because defendant's performance was not as strong as previous years.

-4-

*C. Store Manager Salaries*

Store sales volume establishes the salary range for its managers. The range for lower-volume stores is lower than that for higher-volume stores, but the ranges are broad and overlap. It is therefore possible for the manager of a higher-volume store to be out-earned by the manager of a lower-volume store.

*D. Defendant's 2008 Associated Wholesale Grocers, Inc. Transaction*

In February 2008, defendant made major organizational changes in conjunction with a transaction with Associated Wholesale Grocers, Inc. ("AWG"). The transaction resulted in store acquisitions and closings. Nineteen store managers were impacted in one way or another. The following chart depicts actions that are relevant to this case. In addition to the actions listed on this chart, nine other managers transferred stores as part of the reorganization.

| **Employee** | **Race** | **Gender** | **Action** | **Sales Volume Increase or Decrease** |
|---|---|---|---|---|
| Plaintiff | African-American | Female | Transferred | Decrease |
| Debbie Schauf | Caucasian | Female | Transferred | Increase |
| Sheryl Henderson | Caucasian | Female | Transferred | Increase |
| Lisa Scheutz | Caucasian | Female | Transferred | Decrease |
| Janel Brandstoettner | Caucasian | Female | Transferred | Increase |
| Bob Foster | Caucasian | Male | Transferred | Decrease |
| Francis Wasigner | Caucasian | Male | Transferred | Decrease |

| Ron Wentling | Caucasian | Male | Lost manager position; demoted | N/A |
| LeAnn Opat | Caucasian | Female | Lost manager position; demoted | N/A |
| James Wasinger | Caucasian | Male | Lost manager position; demoted | N/A |

*E. Plaintiff's Transfers*

Defendant has transferred plaintiff from one Topeka store to another several times over the years. As a manager, plaintiff has transferred four times. As an assistant manager, twice. As a manager trainee, once. Plaintiff asks the court to consider the circumstances of her 2004 transfer as evidence of discrimination relating to her 2008 transfer.

As previously mentioned, in 2004, plaintiff transferred from Store #54 to Store #67. Although the sales volume for the stores were relatively equal, Store #67 had a slightly higher sales volume. Plaintiff replaced Mr. Foster at Store #67. Mr. Dunham replaced plaintiff at Store #54, which was a lower-volume store than his previous store. Mr. Foster replaced Mr. Dunham (which took Mr. Foster to a higher-volume store).

In 2008, Colleen Juergensen, Dillon's Vice President of Operations, was responsible for making all of the transfer decisions connected with the AWG transaction that resulted in plaintiff's transfer. She sought input from other executives, but Ms. Juergensen was solely responsible for making sure that the Company "had the right people in the right place." (Doc. 38, Ex. F, at 9.) Transfers affected and applied to both Districts 3 and 5 of the company. All store managers report to Ms. Juergensen, and the job responsibilities, bonus plans, and compensation structure is the same across the districts, or "zones."

When Ms. Juergensen looked to fill a recently-vacated manager position at Store #47, she

-6-

"looked at the capabilities that [plaintiff] exhibits and how she ha[d] been successful in the past, and determined that she would be the best for Store 47 going in the future as [defendant] went through the [AWG] acquisition." (*Id.* at 12–14.) Store #47 was struggling, and Ms. Juergensen testified in deposition that plaintiff was a good fit for Store #47 because of "[h]er knowledge of the customer base at 47, her engagement with the customers, her coaching and teaching skills. And I knew she was successful at 47 before, and I knew with the added volume that was eventually going to come to 47, she would be the best fit for that store going forward." (*Id.* at 58–59.) Ms. Juergensen considered the transfer a reward for plaintiff's success, and she gave her a pay increase—a 3.4% salary raise. Ms. Juergensen considered the transfer a promotion.

After deciding to transfer plaintiff to Store #47, Ms. Juergensen needed to fill plaintiff's position at Store #67. Ms. Juergensen determined that Mr. Foster would be the best fit for Store #67 because he had prior experience with that store. Mr. Foster had fourteen years more experience than plaintiff.

Plaintiff was advised in February 2008 that another store would be closing soon, and that Store #47 would pick up its pharmacy files, resulting in a sales volume increase. The closure and transfer occurred as expected, and Store #47's sales volume increased as expected.

### F. *Plaintiff's Allegations Regarding Her 2008 Transfer*

Plaintiff believes that defendant transferred her in 2008 for discriminatory reasons because "there was no other reason to do so." (Doc. 58, Ex. A, at 23.) In her deposition, plaintiff testified that she did not have any other facts or information that defendant transferred her because of her race and gender. She stated, "It's just my experience what I've dealt with and the conversations that I had and the fact that answers are changed, that sort of thing. I strongly believe that—that they're trying to cover themselves by making the moves now. That's—I can't tell you why but that is what

I feel." (*Id*. at 96.) She also stated that she "believe[s] that the company has created a culture where they find it important to protect the salary of the white male managers." (Doc. 45, Ex. A, at 98.) Finally, plaintiff cites the fact that no other African-American managers work for defendant in support of her position that her transfer was discriminatory.

## II. STANDARDS FOR JUDGMENT

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

Under Title VII, plaintiffs may proceed under two theories of discrimination: (1) disparate treatment and (2) disparate impact. *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1186 (10th Cir. 2006). Disparate treatment occurs where the employer treats people less favorably for a discriminatory reason—based on race, sex, or other prohibited reasons. *Id.* at 1187 (citation omitted). Disparate impact claims, on the other hand, involve facially-neutral employment practices that negatively impact a particular group and are unjustified by business necessity. *Id.* For a disparate impact claim, the plaintiff need not prove discriminatory motive. *Id.*

### A.  *Disparate Treatment Claim*

Plaintiff seeks to prove her disparate treatment claim through circumstantial evidence. While this form of proof is permissible, *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000), it triggers use of the familiar three-part burden-shifting framework set forth in

-8-

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). Step One of the *McDonnell Douglas* test requires that plaintiff establish a prima facie case of gender and/or racial discrimination. To do this, plaintiff must show that (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) defendant treated similarly-situated employees differently. *Trujillo v. Univ. of Colo. Health Scis. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998) (citations omitted).

If plaintiff carries that burden, then defendant must address Step Two—articulating a facially nondiscriminatory reason for the challenged employment action. *Id.* (citations omitted).

If defendant makes such a showing, the burden reverts to plaintiff for Step Three—proving that the proffered nondiscriminatory reason is pretextual. *Id.* (citations omitted).

1. Prima Facie Case

Plaintiff, as an African-American female, is a member of a protected class. Defendant claims, however, that plaintiff is unable to establish either the second or third elements of her prima facie case: that she suffered an adverse employment action, or that defendant treated other similarly-situated employees differently.

*a. Adverse Employment Action*

To show an adverse employment action, plaintiff must show more than a "mere inconvenience or alteration of job responsibilities." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998). Rather, plaintiff must show that she suffered a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (defining a "tangible" employment action in the context of a Title VII hostile work environment claim).

Plaintiff alleges that her 2008 transfer to a lower-volume store was an adverse employment action. After the transfer, plaintiff ultimately made less money that year because she received a lower bonus payout. But when defendant transferred plaintiff, defendant gave her a 3.4% salary increase. Defendant also inflated plaintiff's bonus potential above the amount that was set for Store #47. And although Store #47 had a $17,000 bonus potential, defendant allowed plaintiff to transfer with a one-year $23,000 bonus potential, which was higher than she would have received if she had remained with Store #67 (which had a $20,000 bonus potential). Finally, the company viewed plaintiff's transfer as a promotion.

Plaintiff's position is based on the assumption that a lower-volume store directly translates to a lower bonus payout. The uncontroverted evidence, however, does not support this assumption. The record indicates that the total sales volume of a store determines the maximum bonus potential for a store, but not the actual bonus payout for a manager. The sales volume is one factor in calculating bonus payout—amounting to about 35% of the bonus score. Plaintiff also ignores that defendant took measures to try to increase Store #47's sales volume. Specifically, defendant transferred the pharmacy files from another store to Store #47. The fact that plaintiff actually did receive a lower bonus payout after the transfer does not make her transfer an adverse employment action. The evidence also shows that across the company, bonus payouts for managers were lower in 2008 because the company did not perform at the same level it performed in 2006 and 2007.

In sum, there is only one sliver of evidence suggesting that the court could find a genuine issue of material fact as to whether plaintiff suffered from an adverse employment action: the fact that plaintiff received a lower bonus payout than she had received previously. But this payout is not tied solely or even primarily to the store's sales volume. Plaintiff's assumption that she would have received a larger bonus payout had she remained at Store #67 is nothing but conjecture and

-10-

speculation. The court determines that as a matter of law, plaintiff did not suffer an adverse employment action.

*b. Treatment of Similarly-Situated Employees*

Even if the court were to determine that plaintiff suffered an adverse employment action, plaintiff has not shown that she was treated any less favorably than other similarly-situated employees.

Plaintiff's transfer was part of an organizational change. At least nineteen store managers were impacted. As the chart on page 5–6 of this Memorandum and Order demonstrates, defendant transferred three other Caucasian managers from higher-volume stores to lower-volume stores. Two of these managers were male, and one female. And three Caucasian store managers (two male, one female) were demoted as a part of the reorganization.

Ms. Juergensen made all of the decisions related to the reorganization. All managers reported to her. Even though some of the other managers impacted were in different zones or districts, they all had the same bonus plan, compensation structure, job functions, and duties. The court determines that, as a matter of law, they were similarly-situated to plaintiff. Plaintiff's arguments that managers in other zones were not plaintiff's "relevant cohort" are unconvincing. Ms. Juergensen testified that she had the "final say" in moving managers. (Doc. 45, Ex. B, at 20–21.) While she had conversations with Ms. Falor about transfers, she stated that she "would tell her this was my game plan of where I thought the moves were going to be, but I would just ask her for what her thoughts were. But yet I still made the final decision." (*Id.* at 13.) Despite plaintiff's unsupported allegations to the contrary, when Ms. Falor was asked about her involvement with the transfer, she testified that her involvement was to inform plaintiff about the transfer. (Doc. 45, Ex. D, at 16.) For these reasons, plaintiff's prima facie case of disparate treatment fails.

-11-

### 2. Facially Nondiscriminatory Reason

Although the court determines that plaintiff cannot establish a prima facie case of disparate treatment, the court continues with its analysis. Defendant has offered a facially nondiscriminatory reason for plaintiff's transfer. Specifically, defendant has set forth its transfer policy and explained that Ms. Juergensen believed that plaintiff would be a good fit to fill the Store #47 vacancy.

### 3. Pretext

Finally, even if the court were to assume that plaintiff could make it to Step Three of the *McDonnell Douglas* burden-shifting test, plaintiff cannot survive the inquiry of whether defendant's reason for her transfer is pretextual.

To establish pretext, plaintiff must show either that "a discriminatory reason more likely motivated [defendant] or . . . that [defendant's] proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Plaintiff may accomplish this by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [defendant's] proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence. . . ." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (citation and internal quotation marks omitted). But plaintiff's "mere conjecture that [defendant's] explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988).

As pretext, plaintiff offers her 2004 transfer, which she claims was from a higher-volume store to a lower-volume store. Plaintiff's characterization of the 2004 transfer is inaccurate. She was actually transferred to a slightly higher-volume store in 2004, rendering the transfer insufficient to support plaintiff's position.

Plaintiff claims that defendant gave inconsistent reasons for different transfers. She claims

that Ms. Falor told her that defendant transferred plaintiff in 2008 to protect Mr. Foster's earnings because of his seniority. According to plaintiff, this contradicts other representations that seniority is not a factor in transfers. She points out that although defendant contends that transfers are good for business, one manager—Ron Wells—has been at Store #37 for longer than the average tenure. Finally, she states that other managers had her skill sets and argues that Ms. Juergensen should have also considered those other unnamed managers for the transfer to Store #47.

Plaintiff also describes defendant's company culture as one that perpetuates advantages to Caucasian males. Plaintiff notes that there are no other African-American managers and that she was moved from higher-volume stores to lower-volume stores. And plaintiff discusses two instances that she believes show animosity toward the African-American race: (1) at the 2010 service awards banquet, the company president wore an "afro" wig; and (2) her current district manager, Kim Svoboda, once stated that she "could put a monkey in [plaintiff's] store and get the same results."

Plaintiff's attempts at showing a question of pretext sufficient to survive summary judgment are unsuccessful. First, all of the information contained in the previous two paragraphs is from plaintiff's additional facts that fail to comply with D. Kan. R. 56.1. The court therefore does not consider them. But were plaintiff to believe that, but for her failure to comply with a local rule, she may have avoided summary judgment, the court further determines that plaintiff's additional facts—even if accepted—fail to show that defendant' proffered reason for her transfer was a pretext for discrimination. Plaintiff conceded in her deposition that she could not fully explain the reason for her suspicion: "There's no facts. Nobody writes down we're moving you because you're a black female. It's just my experience what I've dealt with and the conversations that I had and the fact that answers are changed, that sort of thing. I strongly believe that—that they're trying to cover

themselves by making the moves now. That's—I can't tell you why but that is what I feel." (Doc. 45, Ex. A, at 96.) Plaintiff's personal opinion is insufficient to create a triable fact regarding pretext. *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1190–91 (10th Cir. 2002) (citing *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1317–18 (10th Cir. 1999)).

The facts that she asserts to show pretext consist of a few stray remarks by non-decisionmakers, speculation and conjecture, and unsubstantiated assumptions. And the incident involving the president occurred well after the transfer at issue in this case. Plaintiff fails to offer any nexus between his action and her transfer. *Cf. Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir. 1994) ("Isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions.") (internal quotation marks and citation omitted). Even if the court were to consider plaintiff's statements submitted in violation of the court's local rule—and even if she had established a prima facie case of discrimination—the court would still grant summary judgment on her disparate treatment claim.

### B. Disparate Impact Claim

A plaintiff suffers disparate impact when a fair-in-form employment practice operates in a discriminatory manner. *Bullington*, 186 F.3d at 1312 (citation omitted). To prevail on a disparate impact theory, plaintiff first bears the burden of establishing a prima facie case. This does not require, however, proof of discriminatory intent. *Id.* (citation omitted). Instead, it requires plaintiff to show that a specific practice or policy had a "significant disparate impact on a protected group." *Carpenter*, 456 F.3d at 1187 (citation and internal quotation marks omitted). Plaintiff's burden is heavy; she is not entitled to receive the presumption of discrimination that accompanies establishment of a prima facie case unless and until she actually proves the discriminatory impact. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1152 (10th Cir. 2008) (citation

omitted).

If plaintiff meets her burden, then defendant must show that the challenged practice or policy is job-related and backed by a business necessity. *Bullington*, 186 F.3d at 1312; *see also* 42 U.S.C. § 2000e-2(k)(1)(A)(i). The business necessity requirement does not mean that the challenged action must be "essential" or "indispensible" to defendant's business. *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1429 (10th Cir. 1993). Rather, the "dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer." *Id.* (citing *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1244 (10th Cir. 1991)). And if defendant meets its burden, then it is plaintiff's turn to "suggest an alternative employment practice that serves the employer's legitimate employment goals yet lacks the undesirable discriminatory effect." *Ortega*, 943 F.2d at 1244.

1. Prima Facie Case

As mentioned previously, plaintiff is the only African-American female manager within defendant's company. This makes it particularly difficult to conduct a statistical analysis based on the number of African-American female managers impacted by defendant's actions. *See Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 746 (10th Cir. 1991) (finding a group of nine too small to offer reliable statistical results); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1161 (10th Cir. 1991) (noting that statistics may be used to demonstrate a disparate impact, but holding that a sample of one is too small). And plaintiff has not offered any evidence—statistical or otherwise—to support her theory.

Instead, plaintiff bases her argument on a recharacterization of defendant's employment practice. Instead of accepting the relevant practice as that of transferring managers, plaintiff claims that the employment practice at issue is "transferring store managers in order to protect the earnings

-15-

of white male store managers." (Doc. 42, at 19.) But phrasing defendant's action this way suggests a facially discriminatory motive, and takes it out of the realm of disparate impact. *See Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995) ("Because Bangerter challenges facially discriminatory actions and not the effects of facially neutral actions, we conclude that his claim is one of disparate treatment and not disparate impact."). Plaintiff's claim—termed in the manner that plaintiff urges—is not properly a disparate impact claim.

Moreover, because plaintiff failed to comply with D. Kan. R. 56.1, the court has disregarded plaintiff's evidence suggesting that Ms. Juergensen made the decision to transfer plaintiff in order to protect Mr. Foster's income. Even if the court were to consider plaintiff's disparate impact claim based on plaintiff's portrayal of it, plaintiff has no evidence to support it.

For these reasons, plaintiff's disparate impact claim fails at the prima facie stage of analysis.

2. Defendant's Business Necessity

Once again, even if the court were to assume that plaintiff could meet her burden of establishing a prima facie case of disparate impact, she still cannot prevail. Defendant presented evidence of the benefits derived from its store transfer practice. Plaintiff has not offered any evidence to contradict defendant's position. Defendant's evidence shows that defendant's transfer practice significantly serves its legitimate employment goals.

3. Alternative Employment Practice

Plaintiff has not suggested an alternative employment practice that would have served defendant's goals without any alleged discriminatory effect. She has not met her burden on this issue, and her claim would fail even if she were able to establish a prima facie case.

*C. Conclusion*

For all of the above-stated reasons, the court determines that summary judgment is

appropriate. Based on the uncontroverted facts, defendant is entitled to summary judgment on plaintiff's disparate treatment and disparate impact claims.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 37) is granted. The case is closed.

Dated this 18th day of November 2010, at Kansas City, Kansas.

                                        **s/ Carlos Murguia**
                                        **CARLOS MURGUIA**
                                        **United States District Judge**